THE STATE, DEFENDANT IN ERROR, v. JOHN COLLINS, PLAINTIFF IN ERROR.

Submitted March 27, 1899—Decided June 19, 1899.

1. Under the statute entitled "A supplement to an act for the punishment of crimes" (Revision), approved March 27th, 1874, which supplement was approved March 22d, 1895 (*Pamph L., p.* 593), knowledge on the part of the accused of the character of the lottery policy slips and papers found in his possession is of the gravamen of the offence created by the statute.
2. Although the accused at the trial of an indictment against him under the statute deny his knowledge of the character of the slips or papers found in his possession, yet the fact of his possession may be considered by the jury upon the question of knowledge in determining his guilt or innocence, and notwithstanding his denial the jury may convict the defendant upon circumstantial evidence, if satisfied by it of his guilt beyond a reasonable doubt.

---

On error to the Supreme Court.

For the state, *James S. Erwin*, prosecutor of the pleas.

For the defendant, *Alexander Simpson*.

The opinion of the court was delivered by

LIPPINCOTT, J. The defendant below was indicted under the statute for unlawfully and knowingly having in his possession certain papers, documents, slips and memoranda, commonly called books, that pertained to the business of lottery policy. Upon this indictment he was convicted, and the judgment rendered thereon was affirmed on writ of error by the Supreme Court. The judgment of that court has now been removed into this court for review.

The statute under which the defendant was indicted and convicted and which is a supplement to the Crimes act (*Gen. Stat.*, *p.* 1104, § 295), provides "that any person who shall knowingly be engaged as a messenger, clerk or copyist, or in any other capacity in and about any office or room in any building where lottery slips or copies of numbers of list of drawing of any lottery drawn or alleged to be drawn anywhere within or without this state shall be printed, kept or used in connection with the business of lottery, or lottery policy, so called, or any person who shall knowingly have in his or her possession any paper, document, slip or memorandum, that shall pertain in any way to the business of lottery policy, so called, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding two hundred dollars, or imprisonment not exceeding two years, or both." *Pamph. L.* 1895, *p.* 593.

There are two formal assignments of error—one that there was no proof from which the jury could legally infer knowledge on the part of the defendant of the character of the papers found in his possession; the other that there being no proof of the guilty knowledge of the defendant, the trial court should have charged the jury to acquit him. There are no specific errors assigned upon the admission or rejection of evidence, nor to the charge of the court to the jury, and an

examination of the entire record reveals no fault in these respects.

The entire record and proceedings at the trial have been certified to this court, and the conviction is here upon review under the sixty-third chapter of the laws of 1894. *Gen. Stat., p.* 1154.

The evidence is that the defendant was, on the 11th day of June, 1896, arrested and taken into custody at Jersey City, where he then resided. He was arrested upon Exchange place; he was taken to police headquarters and there searched, and in one of his inside pockets was found an envelope of lottery policy slips of the character mentioned in the statute. This was between five and six o'clock in the afternoon of that day. When he was arrested he was on the point of going into the ferry-house on his way to New York. The purport of these lottery policy slips was fully proved in the case of the state. By some they are called policy books or memorandums, but they contain the numbers upon which the wagers or guesses are made as to the lucky numbers of the drawings. At the time search was made of the defendant and these lottery policy slips or books were discovered in his possession and taken from him, he offered no explanation whatever—he said nothing whatever.

The defendant tendered himself as a witness in his own behalf, and he says he merely happened to be standing on the corner of Montgomery and Warren streets in Jersey City on this day, about half-past five when one Dick Jones gave him the envelope and was told by Jones to go across the river, and he (Jones) would meet him on the other side at the Glen Island hotel by the next boat. The defendant without further questions to Jones said he would do so, after being assured that there was some money in the job, and started for the ferry where he was arrested. At that time he had no occupation except carrying this class of messages for Jones. He denies that he knew what the envelope contained, and when he was asked if, when these things were taken from him at the station-house, he was not sur-

prised at the contents of the envelope he evaded the question and answered that he "was surprised at getting hauled in." He testifies that there was no address on the envelope; he was to take it to the Glen Island hotel in New York, and give it to the man Jones, who gave it to him on the corner of Montgomery and Warren streets in Jersey City, who was to meet him in New York for that purpose; that Jones was a sporting man in the horse-race business; that he had often carried these envelopes before in this way. As an excuse for Jones not going with him, he testified that Jones told him he had a few friends to meet. He testifies that he carried for this one party Jones to New York at least once a week, also for him to the express office in Jersey City. He says in one place that Jones was to meet him on the next boat across the river. In another place that he was to meet him in New York. The defendant, besides, is very evasive as to his acquaintance with Jones, and where he was located in business. The witness locates Jones only on the corner of streets; says he was a sporting man, and so far as the defendant knows his only business was hanging around streets and giving this defendant envelopes to take across the river, Jones to meet him over there and take them from him again.

The jury had the right to conclude, from all the facts proved in the case, that he knew just what he had in his possession. His silence, when confronted with the lottery policy slips, when taken from him, was a significant circumstance upon the question of knowledge.

From the evidence in the case, without reference to the testimony of the defendant, the jury could fairly conclude that both the defendant and Jones were in the lottery policy business, and that the defendant, at least, was a runner in that business, carrying these slips from Jersey City to New York.

That the defendant did not know this would be to charge him with entire unconsciousness of his surroundings, and from this evidence it is a necessary conclusion that his defence of the want of knowledge of the character of the papers in his

possession was a pretence, or rather an experiment upon the credulity of the jury.

In the face of the facts and his own evasive evidence it would be difficult to perceive how the jury could arrive at any other verdict than that of guilty.

The facts were all submitted to the jury. The court charged the jury that "this mere fact that papers of the description of those in evidence were found in the possession of the defendant, is not sufficient to convict him of any offence." This was fully as favorable as it ought to have been, perhaps more so, because it is for the jury to determine whether from the possession and its character, guilty knowledge can be inferred. Again in immediate connection with the above paragraph the trial judge said to the jury : "The essence of this offence is the wrongful mind with which it is done, and without which it cannot exist. In a case of this description the mere fact that certain slips or papers are prohibited by statute and made criminal, yet even when found upon the person does not raise any presumption of guilt against the defendant, or that he had them with guilty knowledge. It must appear beyond reasonable doubt that in the mind of the defendant charged with the offence that there existed knowledge of the criminal character of the slip of paper, and that he had the same in his possession with the knowledge that the same pertained in some way to the business of lottery policy."

It is not readily perceived how the defendant could have insisted on any more favorable statement of the law in his behalf to be applied to the facts.

Again the trial judge said to the jury : "Considering all the testimony in this case, are you or not satisfied that this defendant knowingly was carrying these slips or papers ? This statute means just exactly as it reads. The purpose of this act is to eradicate this business. It is a business that is carried on secretly under cover; all subterfuges possible are resorted to, to avoid the detection and conviction of those who engage in it. It may be that those who are behind this pro-

hibited business, who are deriving the profits from it, employ innocent persons in the capacity in which it is charged the defendant was employed. But it is for you to determine in view of all the evidence in this case, whether the employer of this defendant employed him without knowledge on the part of the defendant as to the character of the business in which he was employed, if he was employed in any manner prohibited by that part of the statute I have read to you. This defendant is entitled to the benefit of a reasonable doubt. You cannot convict him of the offence charged against him unless you are satisfied from the evidence beyond a reasonable doubt of his guilt. All of the essential facts and matters which I have called your attention to must be proved to your satisfaction beyond a reasonable doubt before you can convict the defendant."

The purpose of the act is truly stated by the court, and it was a comment entirely appropriate to the subject-matter. There was no comment of fact inimical to the defendant, and the jury were left free to deal with the facts as they chose under the law, with warning that the jury must be satisfied, beyond a reasonable doubt, of the guilt of the defendant before conviction should follow.

When the jury in the performance of their duties applying the correct principles of the law given them by the court, as conscientious men, naturally and reasonably from the evidence either of a positive or circumstantial character reach the conclusion of guilt, the principle that the conviction must be beyond reasonable doubt, has been satisfied. If the jury cannot reach such conclusion, naturally and reasonably, then innocence must be declared, for then reasonable doubt of guilt exists, and to all intelligent jurors the term "reasonable doubt" best defines itself.

There appears to be no error in the admission or rejection of evidence, nor in the submission of the case by the court to the jury.

The evidence has been examined and is of such a nature

that it should satisfy a considerate mind beyond reasonable doubt of the guilt of the defendant.

The entire record has been examined and no reason appears to justify a conclusion that the defendant had suffered manifest wrong or injury by rejection of testimony or in the charge made to the jury, or in the denial of any matter by the court which was a matter of discretion, or upon the evidence adduced at the trial. *Gen. Stat., p.* 1154, § 170 ; *Kohl* v. *State,* 30 *Vroom* 445 ; *Winters* v. *State,* 32 *Id.* 613 ; *Malynak* v. *State, Id.* 562.

The judgment must be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, GUMMERE, LIPPINCOTT, LUDLOW, VAN SYCKEL, ADAMS, BOGERT, HENDRICKSON, NIXON, VREDENBURGH. 12.

*For reversal*—None.